UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

HESCO PARTS, LLC                                                                                PLAINTIFF

v.                                                                          CIVIL ACTION NO. 3:02CV-736-S

FORD MOTOR COMPANY, et al.                                                            DEFENDANTS

**MEMORANDUM OPINION**

  This matter is before the court on motion of the defendant, Visteon Corporation ("Visteon"), for summary judgment (DN 178) on the Second (Breach of Contract), Fourth (Breach of Implied Covenant of Good Faith and Fair Dealing), Seventh (Fraud), and Twelfth (Tortious Interference with Economic Advantage) Counts of the Second Amended and Supplemental Complaint. For the reasons set forth herein, the motion will be granted.

I. Facts

A. Undisputed Facts as Found in September 22, 2006 Ruling

  Hesco is a Kentucky corporation with its principal place of business in Louisville. Ford Motor Company ("Ford") and Visteon are Delaware corporations with their principal places of business in Dearborn, Michigan.

  Before 2000, Visteon was wholly owned by Ford. It was an internal supplier of parts for the production and servicing of Ford cars and trucks. Ford spun off Visteon in early 2000 as a separate and independent corporate entity. Visteon continued to supply parts for the production and servicing of Ford cars and trucks after the spin-off. Visteon remains a substantial supplier of parts to Ford. Ford does not manufacture any of the replacement parts that it purchases from Visteon.

  Ford buys replacement parts from Visteon and resells them primarily to Ford dealerships for use in their service operations or for resale to their customers. Visteon also makes replacement parts

for Ford cars and trucks that it sells to distributors such as Hesco for resale. Visteon also sells some Ford replacement parts directly to its own customers.

Beginning in 1998, Hesco remanufactured certain parts, specifically starters and alternators for Visteon. In the fall of 2001, Visteon approached Hesco with a proposal that it become a distributor of climate control and heat transfer parts that were manufactured by Visteon's Climate Control Division and were sold under a Visteon brand name. Hesco agreed to purchase $2.2 million in Visteon-brand climate control and heat transfer parts. Visteon knew that Hesco's customer base for resale of these and other items included Ford dealerships.

In 2002, Ford pressured Visteon to discontinue its distributor relationship with Hesco. Ford and Visteon entered into an agreement which resulted in the termination of the Visteon-Hesco relationship July, 2003.

B.  Additional Undisputed Facts Pertinent to this Decision

Pertinent to this motion are facts concerning the one-year distribution agreement entered into between Visteon and Hesco.

On March 13, 2002, Visteon and Hesco entered into a Letter Agreement entitled "Visteon 2002 Level II Radiator Condenser 20K-unit Program" for the sale of climate control products by Visteon to Hesco for one year beginning April 1, 2002. The agreement contained neither an early termination nor a renewal provision. There is no contention that such terms were ever discussed or considered. The agreement did not address who Hesco's customers would be. However, the parties do not dispute that Visteon sought to develop distribution channels for its products to new and incremental customers such as collision and body shops, garages, fleets and other non-dealership customers in the independent aftermarket. Casanova dep., pp. 38, 59. Visteon's largest customer was Ford, whose Customer Service Division purchased Ford-branded aftermarket products which were sold to Ford dealerships. Cassanova depo., p. 50. Visteon sold the same (Visteon-branded) aftermarket products to Hesco for distribution. It is also undisputed that Hesco was a former

manufacturer and distributor for Ford for nearly fifty years and had a strong relationship with Ford dealers. Historically, Hesco did not sell into the independent aftermarket, but rather sold primarily to Ford dealers. Hesco's plan for shifting from dealer sales to the independent aftermarket was described by Hesco's Sales Manager, James Keith Gartland, as follows:

> Well, we were going into each of these towns anyway. We were going right past all these other customers that we wouldn't touch because we valued Ford dealers business, and we didn't know whether this Ford dealer was actually selling this customer or not. We weren't going to sell them direct and get the Ford dealer mad at us. So, once we got the Visteon product going at the Ford dealer, and then we started hitting this aftermarket because the Ford thing had gone away with us. Then we had to – the Ford dealer wouldn't buy a lot from us because they were loyal to Ford, which they should be. And we went to the independent aftermarket. But the plan was to hit the Ford dealers first and then come back and hit the independent body shops from there to the fleets.

Gartland depo., p. 122. Gartland testified that the independent aftermarket was going to be a "big target" for Hesco, and that, once it "got up and selling the product," it would "eventually be [Hesco's] biggest target." Gartland depo., p. 82. Larry Ensor, Hesco's Vice President, confirmed with Visteon that they could sell to Ford dealers as long as the product was not going to be used for warranty replacement, and confirmed to Visteon that Ford would not be Hesco's primary customer. L. Ensor depo., p. 336-38.

In a nutshell, the parties performed under the agreement until its expiration on March 31, 2003, and continued to do business for a period thereafter. Beginning shortly after the execution of the letter agreement and continuing throughout the period, Ford and Visteon came to believe that the majority of Hesco's sales were to Ford dealerships. Despite the fact that the agreement did not prohibit these sales and that Ford knew that some of Hesco' sales would be to dealerships, Ford became unhappy with the arrangement and pressured Visteon to end its relationship with Hesco. In July of 2003, Visteon ceased selling products to Hesco.

## II. Law

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

The parties agree that the result herein is the same under either Kentucky or Michigan law, and cite cases from both states and the courts in the Sixth Circuit.

### A. Breach of Contract

In the Second Count of the Second Amended and Supplemental Complaint, Hesco alleges that Visteon breached oral and written distribution agreements it had with Hesco. Second Count, ¶¶ 126, 128. There is no dispute that the parties performed under the one-year letter agreement, and the agreement then expired according to its terms. However, Hesco contends that by continuing to sell Hesco products after the agreement's expiration date, the contract was renewed for another one-year term. Therefore, it urges that Visteon breached the renewed agreement when it ceased doing business with it in July, 2003.

There is no contention that renewal of the letter agreement was ever discussed by the parties. Hesco's renewal argument is based solely upon the actions of the parties in continuing to do business.

Hesco urges that where a contract expires by its terms, but the parties continue to perform as before, an implied contract governed by the same terms as the earlier written contract exists. First, it should be noted that Hesco did not plead an implied contract theory in its complaint. In any event, Hesco relies upon three cases which are all distinguishable from the case at bar.

In *Fuger v. Briggs & Stratton Corp*, 178 F.3d 1294, 1999 WL 196505 (6th Cir. 1999), an unpublished 6th Circuit opinion, the parties entered into a 3-year, written contract for the plaintiff to work as a commissioned salesman for the defendant manufacturer. Prior to the termination of the contract, the marketing manager for the manufacturer engaged in discussions with the plaintiff about renewing the agreement. He followed up with a letter stating that the manufacturer intended to extend the contract for an additional four-year term and referenced the plaintiff's willingness to "work at a reduced percentage" due to the low profit margin on a particular project. The plaintiff did not submit a formal response to the letter. instead, he continued to work after the expiration of the agreement and received commissions, but attempted to negotiate a longer contract term and a higher commission rate. The plaintiff responded by letter some months later stating that he wished to finalize the renewal of his contract. The court concluded that no new contract had been fully negotiated or executed, but that the letter offering to extend the contract extended the *original* contract for an additional three-year term. The *Fuger* case differs from the case before us in that there was clear evidence of the intent by both parties to renew the contract.

We find that *Cloverdale Equipment Company v. Manitowoc Engineering Company*, 149 F.3d 1182, 1998 WL 385906 (6th Cir. 1998), also an unpublished decision, to be wholly unhelpful. The court's conclusion that an implied contract between the parties existed was based upon the finding

that no material facts were in dispute and that neither party denied the existence of an implied contract. *Cloverdale, supra.,* at *3.

We similarly find *Comenos v. Viacom International, Inc.*, 857 F.Supp. 1160 (E.D.Mich. 1994) to be unhelpful in our analysis. The court there applied New York law in evaluating a new employment contract had been implicitly created by the conduct of the parties. The court noted that where an agreement expires by its own terms and the parties continue to perform as before, an implication arises that they have mutually assented to a new contract containing the same provisions as the old. The court concluded, however, that summary judgment could not be granted inasmuch as there was a dispute of fact as to whether the parties mutually intended renewal.

The *Comenos* case was discussed in *Iverson Industries, Inc. v. Metal Management Ohio, Inc.*, 525 F.Supp.2d 911 (E.D.Mich. 2007) where the court stated that under New York law, as well as that of Michigan, no presumption or renewal arises, but only a permissible inference that the parties intended to continue the contract. At best, an implication may be inferred, but no shifting of the burden of proof of the intent of the parties to contract occurs therefrom. "Rather, to create or modify a contract, there must be a meeting of the minds." *Iverson Industries,* 525 F.Supp.2d at 918-19, *citing, Port Huron Education Ass'n v. Port Huron Area School District*, 550 N.W.2d 228, 238 (Mich. 1996); *Universal Leaseway Sys., Inc. v. Herrud & Co.*, 115 N.W.2d 294 (Mich. 1962); *Lambert v. Jim Causley Pontiac, Inc.*, 209 N.W.2d 619 (Mich.App. 1973).

The court found in *Iverson* that it could not conclude whether or not an implied contract existed because there was some evidence favoring each conclusion. The court stated, however, that "[c]ontinuation of formula pricing for two or three months certainly does not create an iron-clad inference that the contract was renewed; and if neither party knew there even was a contract[1], it

---

[1] Management had changed at both companies and the original contract terms had been unknown to the corporate staffs.

would be difficult to construct an inference that the parties mutually agreed to continue to be bound by it." *Iverson Industries*, 525 F.Supp.2d at 919.

Under the applicable law, that there must be proof of a meeting of the minds. In the words of the *Iverson* court, there must be a mutual agreement between the parties to be bound to a renewal of the contract. The very evidence offered by Hesco indicates Visteon's dissatisfaction with the situation borne of its letter agreement with Hesco. The fallout received from Ford over Hesco's sales began early in the contract term and continued throughout, despite a number of apparent attempts to minimize the friction. Hesco has come forward with no evidence to suggest that Visteon agreed to be bound to another one-year term of this agreement. We conclude that regardless of the fact that Visteon continued to sell products to Hesco for an additional three months, no renewal of the one-year agreement was intended or consummated. Therefore, Visteon is entitled to summary judgment on the Second Count of the Second Amended and Supplemental Complaint.

B.  Breach of Implied Covenant of Good Faith and Fair Dealing

Hesco contends that Visteon owed it a duty of good faith and fair dealing in its conduct in relation to the letter agreement, and in terminating its agreement with Hesco.

First, there could be no violation of the duty of good faith in connection with Visteon's termination of the agreement as the letter agreement expired by its own terms on March 31, 2003 and was not renewed. As both Michigan and Kentucky courts recognize an "implied covenant of good faith and fair dealing that applies to the performance and enforcement of contracts," *Burton v. William Beaumont Hospital*, 373 F.Supp.2d 707, 718 (E.D.Mich. 2005) and *Ranier v. Mount Sterling National Bank*, 812 S.W.2d 154, 156-57 (Ky. 1991), the court must first find a contract in force before bad faith termination can be considered.

Second, based upon what Hesco has offered on this point, it has not shown bad faith. Hesco cites *Ranier v. Mount Sterling National Bank*, 812 S.W.2d 154, 156-57 (Ky. 1991) for the proposition that the implied covenant imposes upon the parties to a contract the obligation to "do

everything necessary to carry [the contracts] out." Hesco urges that "Visteon's treatment of Hesco was not bound by any concepts of ethics or morality" (Hesco Response, p. 29), citing its "chang[ing] tune" "demanding that Hesco not sell any products to Ford dealers...cutting Hesco's legs out from under it by attempting to preclude sales to the very foundation of Hesco's customer base" after the parties had entered into the agreement. *Id.*, 29-30. This hyperbolic rhetoric is simply not supported by record evidence.

Hesco contends that its legs were cut out from under it because Visteon "demanded" that it not sell "any products" to Ford dealers. The testimony of Ensor and Gartland reflects an essential understanding by Hesco at the time it entered into the agreement that Visteon wanted a distributor to tap the undeveloped independent aftermarket, not to compete with Ford's Customer Sales Division. However, taking Hesco's statements at face value, and assuming that Visteon had a "changed tune" and wanted sales to Ford dealers to stop, this was unsupported, inasmuch as (1) there was no term in the agreement precluding sales to Ford dealers, (2) Visteon continued to sell products to Hesco during the entire term of the contract and for a period afterward, and (3) Hesco did, in fact, sell lots of products to Ford dealers, despite any "demand" to the contrary. Taking the facts in the light most favorable to Hesco, as we are required to do, there is simply no showing of bad faith, inasmuch as the terms of the agreement were fully honored by Visteon, despite Ford's apparent dissatisfaction. Summary judgment will therefore be granted to Visteon on the Fourth Count of the Second Amended and Supplemental Complaint.

### C.  Fraud

There is a single allegation against Visteon in the Seventh Count of the complaint:

> 167.  Although Visteon initially admitted that Ford instructed it to terminate Visteon's relationship with Hesco, Visteon - upon information and belief, in concert with Ford – has falsely and fraudulently denied Ford's involvement, and both Defendants have sought to conceal the anticompetitive reasons for Hesco's termination as a Visteon distributor.

Hesco has not argued this basis for its fraud claim in its response to Visteon's summary judgment motion.  *See*, Hesco's Response, pp. 31-33.  Rather it argues that (1) Visteon knew that Hesco would be relying upon its relationship with Ford dealers to develop its distribution network, and told Hesco that sales to Ford dealers were appropriate; and (2) Visteon concealed the reason for its termination of Hesco.  *Id.*, 32-33.

In order to succeed on a claim for fraud, the plaintiff must show that (1) the defendant made a material misrepresentation (2) that was false; (3) known to be false or made recklessly; (4) made with inducement to be acted upon; (5) acted in reliance thereon; and (6) causing injury.  *United Parcel Service Company v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999); *accord, Diamond Computer Systems, Inc. v. SBC Communications, Inc.*, 424 F.Supp.2d 970, 981 (E.D.Mich. 2006).  Fraud may be committed either by intentionally asserting false information or by willfully failing to disclose the truth.  *Id.*, at 469, *citing, Chamberlain v. National Life & Accident Insurance Co.*, 76 S.W.2d 628, 631 (Ky. 1934); *Restatement (Second) of Torts*, § 529 (1977)(stating a mere partial truth can be fraudulent if it is materially misleading).

With respect to the first basis, Visteon does not deny that Hesco sought to make sales to Ford dealers as well as to customers in the independent aftermarket.  In its brief, Hesco urges that Visteon misrepresented to it that sales to Ford dealers were "appropriate," but Hesco does not cite to any evidence in the record where this term is utilized.  What is undisputed in the record, from the evidence submitted by both parties, is that the sales made by Hesco to Ford dealers were permissible under the contract, and Hesco continued to make those sales despite Ford's apparent displeasure.  Hesco has not identified any record evidence to suggest a material misrepresentations or omissions upon which it relied in entering into the contract.

The contention that Visteon concealed from Hesco the reason for its termination does not state an actionable claim for fraud.  There was no renewal of the 1-year letter agreement.  Thus Visteon could terminate sales to Hesco at any time.  Hesco was not entitled to a basis for the

termination of the relationship, and the alleged concealment of the reason does not support a claim for fraud. Visteon is entitled to judgement as to Count VII.

### D. Tortious Interference with Economic Advantage

Hesco alleges in the Twelfth Count of the complaint that

208. Hesco had a reasonable expectation of continuing economic advantage from its continuing business with Visteon.

209. Visteon had full knowledge of Hesco's expectancy in the continuing economic advantage and that Hesco would lose substantially [sic] lose profitability without that economic advantage.

210. Visteon knew that limiting Hesco from dealing with Visteon would substantially injure Hesco's business.

211. Visteon's actions and inactions intentionally and wrongfully interfered with Hesco's expectation of economic advantage...

213. There is a very reasonable probability that Hesco's economic advantage would continue absent Visteon's tortious interference...

Under both Kentucky and Michigan law, a claim for tortious interference with prospective economic advantage requires a showing of (1) the existence of a valid business relation or expectancy; (2) the defendant's knowledge of the business relation or expectancy; (3) intentional interference by the defendant improperly inducing or causing a breach or termination of the relation or expectancy; and (4) injury to the plaintiff by the defendant's improper or unjustified interference. *See, American Council of Certified Podiatric Physicians and Surgeons v. American Board of Podiatric Surgery, Inc.*, 185 F.3d 606, 624 (6th Cir. 1999); *Monumental Life Insurance Company v. Nationwide Retirement Solutions, Inc.*, 242 F.Supp.2d 438, 450 (W.D.Ky. 2003).

Hesco contends that Visteon tortiously interfered with its business expectancy with Ford dealers and independent customers by terminating its relationship with Hesco. However, Hesco has come forward with no evidence that Visteon did anything improper in ending the relationship with Hesco. Hesco unsuccessfully asserted that the letter agreement was renewed for another term.

- 11 -

Therefore Visteon had no obligation to continue to sell products to Hesco after expiration of the one-year term.  Summary judgment will be granted to Visteon on this claim.

## Conclusion

For the reasons set forth hereinabove, the court finds that no genuine issue of material fact exists with respect to the claims against Visteon and therefore summary judgment will be granted in its favor by separate order.