UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

HESCO PARTS, LLC                                                                     PLAINTIFF

v.                                                             CIVIL ACTION NO. 3:02CV-736-S

FORD MOTOR COMPANY, et al.                                               DEFENDANTS

## MEMORANDUM OPINION

This matter is before the court on two motions for summary judgment by the defendant, Ford

Motor Company (DNs 176, 177).  Ford has divided its summary judgment request into two motions

for ease of addressing facts pertinent to two groups of claims.

The First, Third, Fifth, Seventh, Eighth, Ninth, and Tenth Counts of the Second Amended

and Supplemental Complaint (addressed by DN 177) allege:

| | |
|---|---|
| First Count: | Breach of Contract |
| Third Count: | Breach of Implied Covenant of Good faith and Fair Dealing |
| Fifth Count: | Unjust Enrichment |
| Seventh Count: | Fraud |
| Eighth Count: | Promissory Estoppel |
| Ninth Count: | Quantum Meruit |
| Tenth Count: | Equitable Estoppel |

The Sixth and Eleventh Counts (addressed by DN 176) allege:

| | |
|---|---|
| Sixth Count: | Tortious Interference with Economic Advantage |
| Eleventh Count: | Tortious Interference with Contracts |

I.  Summary Judgment Standard

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent summary judgment.  The disputed facts must be material.  They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute must also be genuine.  The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party.  *Id.* at 2510.  The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).  The evidence must be construed in a light most favorable to the party opposing the motion.  *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

II.  Background

The following background facts are pertinent to resolution of the issues herein.[1]

Hesco is a Kentucky corporation with its principal place of business in Louisville.  Ford Motor Company ("Ford") and Visteon are Delaware corporations with their principal places of business in Dearborn, Michigan.

Before 2000, Visteon was wholly owned by Ford.  It was an internal supplier of parts for the production and servicing of Ford cars and trucks.  Ford spun off Visteon in early 2000 as a separate and independent corporate entity.  Visteon continued to supply parts for the production and servicing

---

[1]The majority of the information has been taken from this court's September 22, 2006 Memorandum Opinion and from the Second Amended and Supplemental Complaint.

- 2 -

of Ford cars and trucks after the spin-off.  Visteon remains a substantial supplier of parts to Ford. Ford does not manufacture any of the replacement parts that it purchases from Visteon.

Ford buys replacement parts from Visteon and resells them primarily to Ford dealerships for use in their service operations or for resale to their customers.  Visteon also makes replacement parts for Ford cars and trucks that it sells to distributors such as Hesco for resale.  Visteon also sells some Ford replacement parts directly to its own customers.

In January of 2000, Ford and Visteon entered into an agreement entitled "Relationship Agreement between Automotive Consumer Services Group [a division of Ford] and Visteon Corporation."  This relationship agreement spelled out the parties' "agreement as to how they will conduct business between ACSG and Visteon going forward."  Relationship Agreement, p. 1.  A September 26, 2001 letter of understanding clarified that the agreement permitted Visteon's Aftermarket Group to ship products to customers whose annual revenue was less than $50,000.00. The aggregate annual revenue of all such Visteon small customers could not exceed $2 million.

For over fifty years, Hesco remanufactured and distributed various parts for Ford ("Ford Authorized Products").  Sometime in the late 1960s, Hesco and others were designated by Ford as Ford Authorized Remanufacturers ("FARs").  Various written agreements governed Hesco's relationship with Ford.  The most recent agreement governing the remanufacturing/distribution relationship was the Ford Authorized Remanufactured Product Distributor Agreement dated April 1, 1995, its Addendum, and the Standard Provisions, also of the same date (collectively referred to as the "FARs agreement" herein).  In 1998, Hesco and Ford entered into the Ford Authorized Distributor Sales Agreement which incorporated the Standard Provisions, and dealt only with Hesco's distribution as a Ford Authorized Distributor ("FAD") at this time (collectively referred to as the "FADs agreement" herein).

Hesco was successful in its business relationship with Ford and grew its facility from 25,000 square feet to 300,000 square feet and at one time had approximately 300 employees.  The great

majority of Hesco's work was dedicated to the remanufacture and distribution of Ford parts and accessories.  Hesco was the recipient of various Ford awards honoring Hesco as an exceptional FAR and Hesco consistently ranked as a leader among FARs in performance.  As of December, 1992, Hesco was authorized to build the following products: air conditioning compressors, air conditioning clutches, alternators, engines, master cylinders, mechanical fuel pumps, brake boosters, brake calipers, carburetors, disc brakes, distributors, drum brakes, electronic fuel pumps, power steering pumps, rack & pinions, starters, steering gears, water pumps, and window lift motors.

Beginning in 1996, Ford began to develop a new business plan which would replace the FARs with FADs who would sell Ford Authorized products remanufactured by independent companies.  This would permit Ford to get out of the business of supplying component parts to the FARs, and would significantly increase the profitability of the remanufactured products business for Ford.  To this end, Ford began de-authorizing various product lines from Hesco and other FARS on a regular basis, and then soliciting bids from independent companies for the remanufacture of new product lines.

Ford was permitted to de-authorize lines from time to time under the Standard Provisions governing the agreements.  Ford generally gave the FARs written notice  three months prior to de-authorizing a line.  After a product line was de-authorized, the FARS were given an opportunity to continue to distribute the remanufactured parts as FAD.  Hesco made the transition according the Ford's de-authorization process, becoming a FAD for many of the de-authorized lines over time.  All of the product lines remanufactured by Hesco were de-authorized by 2001.

In 2001, Ford announced that by the end of the year, FADs would be required to elect to sell either Ford's Powertrain (engines and transmissions) or Motorcraft (other products) brand products.  The FADs were told that they could not sell both.  After analyzing the financial impact of Ford's mandate, Hesco decided to end its relationship with Ford.

Ford replaced the de-authorized FAR product lines with Ford Quality Renewal Product lines ("FQR product lines). FQR products were manufactured uniformly by a single remanufacturer (as opposed to multiple FARs) according to Ford specifications and were eligible for use in Ford warranty repairs. Hesco bid on and won a number of FQR contracts to remanufacture products including engines (1994 bid) and window lift motors (1997 bid). In 1998, Hesco became a supplier of remanufactured FQR starters and alternators to Visteon, which was still a division of Ford at that time. Hesco continued to distribute Ford Authorized Parts as a FAD until it terminated the distribution relationship in 2001. The transition from FAR to FAD cut Hesco's profit tremendously. Hesco has premised this lawsuit, in part, on its contention that Ford breached the 1995 and 1998 agreements by "stripp[ing] Hesco of its remanufacturing business." Second Amended and Supplemental Complaint, ¶ 123. What has been referred to by Hesco as Ford's "exit strategy" for disassembling the FARs system was undeniably motivated, in part, by Ford's desire to make the remanufactured parts business more profitable for itself. FARs who had been used to reaping 35-45% profits were then limited under the FADs agreement to 15%.

Beginning in 1998, Hesco remanufactured certain parts, specifically starters and alternators for Visteon. In the fall of 2001, Visteon approached Hesco with a proposal that it become a distributor of climate control and heat transfer parts that were manufactured by Visteon's Climate Control Division and were sold under a Visteon brand name. Hesco agreed to purchase $2.2 million in Visteon-brand climate control and heat transfer parts.

On March 13, 2002, Visteon and Hesco entered into a Letter Agreement entitled "Visteon 2002 Level II Radiator Condenser 20K-unit Program" for the sale of climate control products by Visteon to Hesco for one year beginning April 1, 2002. The agreement contained neither an early termination nor a renewal provision. There is no contention that such terms were ever discussed or considered. The agreement did not address who Hesco's customers would be. However, the parties do not dispute that Visteon sought to develop distribution channels for its products to new and

incremental customers such as collision and body shops, garages, fleets and other non-dealership customers in the independent aftermarket. Casanova dep., pp. 38, 59. Visteon's largest customer was Ford, whose Customer Service Division purchased Ford-branded aftermarket products which were sold to Ford dealerships. Cassanova depo., p. 50. Visteon sold the same (Visteon-branded) aftermarket products to Hesco for distribution. It is also undisputed that as a former manufacturer and distributor for Ford for nearly fifty years, Hesco had an established relationship with Ford dealers. Historically, Hesco did not sell into the independent aftermarket, but rather sold primarily to Ford dealers. Hesco's plan for shifting from dealer sales to the independent aftermarket was described by Hesco's Sales Manager, James Keith Gartland, as follows:

> Well, we were going into each of these towns anyway. We were going right past all these other customers that we wouldn't touch because we valued Ford dealers business, and we didn't know whether this Ford dealer was actually selling this customer or not. We weren't going to sell them direct and get the Ford dealer mad at us. So, once we got the Visteon product going at the Ford dealer, and then we started hitting this aftermarket because the Ford thing had gone away with us. Then we had to – the Ford dealer wouldn't buy a lot from us because they were loyal to Ford, which they should be. And we went to the independent aftermarket. But the plan was to hit the Ford dealers first and then come back and hit the independent body shops from there to the fleets.

Gartland depo., p. 122. Gartland testified that the independent aftermarket was going to be a "big target" for Hesco, and that, once it "got up and selling the product," it would "eventually be [Hesco's] biggest target." Gartland depo., p. 82. Larry Ensor, Hesco's Vice President, confirmed with Visteon that they could sell to Ford dealers as long as the product was not going to be used for warranty replacement, and confirmed to Visteon that Ford would not be Hesco's primary customer. L. Ensor depo., p. 336-38.

In a nutshell, the parties performed under the agreement until its expiration on March 31, 2003, and continued to do business for a period thereafter. There was no renewal of the contract by the parties. Beginning shortly after the execution of the letter agreement and continuing throughout the period, Ford and Visteon came to believe that the majority of Hesco's sales were to Ford

dealerships.  Despite the fact that the agreement did not prohibit these sales and that Ford knew that some of Hesco' sales would be to dealerships, Ford became unhappy with the arrangement and pressured Visteon to end its relationship with Hesco.  Visteon acknowledged by letter dated May 22, 2002 that it had violated the terms of the relationship agreement by the quantity of sales to Hesco, among others.  Ultimately, Ford permitted Visteon to fulfill outstanding orders with 147 of its customers, including Hesco.  In July of 2003, Visteon ceased selling products to Hesco.

### III.  DN 177

#### A.  Breach of Contract

Hesco alleges that Ford breached the 1995 Agreement and the 1998 FAD Agreement with Hesco by systematically de-authorizing Hesco's remanufacturing product lines, and distribution of product lines, respectively, thus effectively terminating the agreements and without invoking the agreements' termination provisions.

In order to establish a breach of contract, Hesco must show (1) the existence of a contract, (2) the terms of the contract, (3) breach of the contract, and (4) injury caused by that breach. *Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 819 (6th Cir. 1999).

Hesco urges that Ford breached the FARs agreement because the de-authorization of all of the FARs product lines constituted a virtual termination of the agreement.  However, the FARs agreement established Hesco as both a remanufacturer and distributor of Ford Authorized Products. As the remanufacturing aspect diminished, the distribution opportunities were still in place and, in fact, Hesco took advantage of those opportunities, becoming a FAD for various new FQR lines under the FARs and FAD agreements.  Hesco does not dispute that Ford was permitted under the agreements to de-authorize product lines.

Hesco contends that Ford breached the FADs agreement by putting the FADs to the choice of selling either Powertrain or Motorcraft parts.  Again, Hesco does not dispute that the agreement

allowed for such de-authorization by Ford of a line of its products. Hesco initially chose to continue distributing Ford Powertrain parts, but then discontinued its relationship with Ford entirely in December 2001, prior to the date on which the FADs were required to make an elections as to the line they would continue selling.

The terms of the agreements are clear and unambiguous and permitted the de-authorizations which Ford implemented. Hesco has failed to come forward with evidence which demonstrates a breach of either agreement. Summary judgment will therefore be entered for Ford on the First Count of the Second Amended and Supplemental Complaint.


### B.  Breach of Implied Covenant of Good Faith and Fair Dealing

Hesco contends that Ford owed it a duty of good faith and fair dealing in its treatment of Hesco under the FARs and FADs agreements.

Both Michigan and Kentucky courts recognize an "implied covenant of good faith and fair dealing that applies to the performance and enforcement of contracts." *Burton v. William Beaumont Hospital*, 373 F.Supp.2d 707, 718 (E.D.Mich. 2005) and *Ranier v. Mount Sterling National Bank*, 812 S.W.2d 154, 156-57 (Ky. 1991).

There can be no violation of the duty of good faith and fair dealing in the exercise of express contractual rights. *Farmers Bank & Trust Co. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005); *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038 (6th Cir. 1990). "The implied covenant of good faith under Michigan law, as well as under the law of other jurisdictions having persuasive effect, neither overrides nor replaces any express contractual term...It does not provide the basis for a cause of action independent of a valid existing contract...Nor does it require a party to ignore, forego, or waive its express contractual rights." *Van Arnem Co. v. Manufacturers Hanover Leasing Corp.*, 776 F.Supp. 1220, 1223 (E.D.Mich. 1991)(internal citations omitted).

As Hesco's complaint alleges, the de-authorizations began in 1995 and continued through 2001.  Despite Hesco's contention that it was unaware of Ford's "exit strategy" and its designs on the profits which Hesco had been reaping since the 1950s.  There is no dispute that the agreements between Hesco and Ford could be terminated by either party at any time, with or without cause, upon thirty days' prior written notice to the other party.  Standard Provisions, ¶ 17.  Despite Hesco's dissatisfaction with the changing program with Ford, it did not choose to terminate its relationship with Ford until December of 2001.

Hesco notes that *Ranier v. Mount Sterling National Bank*, 812 S.W.2d 154, 156-57 (Ky. 1991) stands for the proposition that the implied covenant imposes upon the parties to a contract the obligation to "do everything necessary to carry [the contracts] out."  Hesco urges Ford found no place for "concepts of ethics or morality" (Hesco Response, pp. 47-48) in its dealings with Hesco, and that it ceased to serve the purpose of the FARs agreement and sought to destroy its relationship with Hesco.  Hesco Response, pp. 44-45.

While Hesco takes great umbrage at Ford's apparent take-no-prisoners view of business, the fact that it was exercising its clear and express contractual rights renders its offensive attitude simply irrelevant to the question of bad faith.

Finally, the argument that Ford ceased to be serving the purpose of the FARs agreement when it de-authorized various product lines is wholly without merit.  To so find would be to state that the contract could never be terminated because the purpose of the FARs agreement was to provide Hesco and other FARs with business.  This assertion is nonsensical and not supported by any evidence.

Summary judgment will be granted in favor of Ford on the Third Count of the Second Amended and Supplemental Complaint.

## C.  Unjust Enrichment/Quantum Meruit

Hesco claims that Ford failed to compensate it for providing Ford "remanufacturing know-how" which permitted Ford to engage in its own business of remanufacturing of starters, alternators, and power steering products.  Hesco Response, p. 57.  Hesco contends that the 1998 Supply Agreement "contemplated Hesco providing certain remanufacturing assistance to Ford, but that Ford never negotiated a final agreement nor compensated it for its assistance."  *Id.*  In fact, what Hesco is referring to as later "contemplated" by the 1998 Supply Agreement was an early draft of the agreement which stated that Hesco would assist Visteon (while it was still a Division of Ford) in launching a Visteon facility in Lamosa, Mexico, which was intended to remaufacture parts.  The draft provision concluded:

> To the extent that Hesco and Visteon determine specifics relating to what Services will be provided and what compensation will be paid to HESCO, such will be set forth in an Appendix to be added to this Agreement upon signature by both parties.

For a number of reasons, no claim for unjust enrichment or quantum meruit may be maintained upon this allegation.  First, this provision was eliminated from what became the final, integrated and executed Supply Agreement between the parties.  Second, the provision offers nothing more than a promise to explore what services Hesco might offer and at what level of compensation, and *to the extent that* Hesco and Visteon determined specifics, such agreement would be memorialized in a signed Appendix to the agreement.  Hesco itself states that no specifics on this subject were agreed upon.  Further, Hesco now complains that Ford's position was "why pay for the cow when the milk is free," and improperly eliminated the provision from the final agreement, thus allowing Ford to access Hesco's facility, its records and to obtain its assistance, as required by the Supply Agreement.  Hesco executed the final, integrated document, however, and cannot revisit the elimination of terms and seek compensation for terms neither promised nor negotiated.  "[T]he doctrine of unjust enrichment has no application in a situation where there has been an explicit

contract which has been performed." *Tractor and Farm Supply, Inc. v. Ford New Holland, Inc.*, 898 F.Supp 1198, 1206 (W.D.Ky. 1995); *Campell v. City of Troy*, 202 N.W.2d 547, 549 (Mich.App. 1972)(a contract will be implied only where no express contract exists). Similarly, the imposition of a "contract implied by law" for the payment of "valuable services rendered" under a quantum meruit theory (*see, ie., Stotts v. Skipworth*, 2008 WL 399315, *3-4 (Ky.App. Feb. 15, 2008) is inapplicable where the provision of those services is addressed in an express contractual provision.

Summary judgment must be granted in favor of Ford on the Fifth and Ninth Counts of the Second Amended and Supplemental Complaint.

### D.  Fraud/Equitable Estoppel

Hesco urges that Ford committed fraud by leading it to believe that its future as a FAD was secure, and thereby inducing it to make investments in its facility and equipment for its performance under the Supply Agreement. Hesco has set forth various statements that it contends constituted material misrepresentations.

In order to succeed on a claim for fraud, Hesco must show that (1) the defendant made a material misrepresentation (2) that was false; (3) known to be false or made recklessly; (4) made with inducement to be acted upon; (5) acted in reliance thereon; and (6) causing injury. *United Parcel Service Company v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999); *accord, Diamond Computer Systems, Inc. v. SBC Communications, Inc.*, 424 F.Supp.2d 970, 981 (E.D.Mich. 2006). Fraud may be committed either by intentionally asserting false information or by willfully failing to disclose the truth. *Id.*, at 469, *citing, Chamberlain v. National Life & Accident Insurance Co.*, 76 S.W.2d 628, 631 (Ky. 1934); *Restatement (Second) of Torts*, § 529 (1977)(stating a mere partial truth can be fraudulent if it is materially misleading).

Hesco's theory of fraud is represented as "a blend of affirmative representations and an orchestrated strategy of material omissions" which concealed Ford's "exit strategy" whereby it intended to take the remanufacturing business away from the FARs.  Hesco's Response, pp. 54-55.

The affirmative misrepresentations identified by Hesco are that (1) it was told that it would "certainly be a leading candidate for any type of [remanufacturing] opportunity, (2) it was told it was "one of the highest qualified FARs," (3) it was told that "for those of you who elect to try to be a supplier,...there will be fewer that will be supplier to the Ford Motor Company than there are FARs today," (4) it was told to "stick around, because you'll be one of us," and it was told that Ford was "going to do business with [Hesco] into the future, and [Ford] like[d] what [Hesco was] doing down there."

The affirmative statements cited above pertain to future events and thus do not establish actionable fraud.  "In order to make a claim for misrepresentation, the alleged representation must pertain to present or preexisting facts, not future events."  *Hunt Enterprises, Inc. v. John Deere Industrial Equipment Company*, 18 F.Supp.2d 697, 702 (W.D.Ky. 1997).

With respect to the concealment of Ford's "exit strategy" and its plan to eventually phase out the FARs system and utilize FADs, the very action taken by Ford in de-authorizing various product lines over time and permitting former FARs to bid for the FQR contracts or seeking to become a FAD for that line was spelled out in the provisions of the Remanufacturing Agreement. Hesco does not contend that it was unaware that Ford had the power to de-authorize lines and that it exercised that right.  Rather, it appears to suggest that Ford's failure to give it the "big picture," so that it knew that its future as a FAR was in jeopardy was somehow fraudulent.  The facts, however, do not bear this out.  Hesco has failed to come forward with evidence of material misrepresentations or omissions which rise to the level of actionable fraud.

Hesco's equitable estoppel claim suffers the same fate as its fraud claim.  Hesco seeks to preclude Ford from denying that it defrauded Hesco.  Hesco's assertion that Ford should be

precluded, as a matter of equity, from denying fraud is based upon the same conduct alleged under its fraud claim.  As we found that Ford has not been shown to have made the required showing on a claim of fraud, we find the same analysis applies equally to claim of equitable estoppel.

Summary judgment will be granted in favor of Ford on the Seventh and Tenth Counts of the Second Amended and Supplemental Complaint.

### E.  Promissory Estoppel

Under a theory of promissory estoppel, a plaintiff must show "(1) a promise, (2) which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (3) which does induce such action or forbearance, and (4) injustice can be avoided only by enforcement of the promise."  *Abney v. Amgen, Inc.*, 443 F.3d 540, 549 (6th Cir. 2006).  Where there is no evidence of a promise, promissory estoppel cannot be established.  *Id.*  As noted in *Shane, supra*, *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir. 1990), and cases cited therein, estoppel cannot form the basis for a claim if it represents the same performance contemplated under a written contract.  It is not a doctrine "designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract."  *Shane*, 200 Fed.Appx. at 404, *citing, Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984).

Hesco contends that various statements made to them during the course of their relationship with Ford from 1988 to 1995 constituted promises upon which it relied in making various business decisions and in expanding its facility.  It contends that it was swayed by statements such as: "I think it's a great idea that you-all move on, move forward, so you can expand."  Mark Hopkins, 1988. "You guys are great.  You stick with it.  I'm going to fill up your plant with engine production." Ken King, 1992 or '93.  "I cannot promise [that Hesco would be one of the remaining remanufacturers], but you hang in there.  You all have a good quality program."  Richard Detskas,

1994-95.  All but the statements of Garry Frederick[2] were made prior to the execution of the 1995 contract.  The statements attributed to Garry Frederick were made immediately prior to the signing of the 1998 contract.

First, these statements are not promises by Ford of any particular substantial or definite benefit or action which could reasonably be expected to induce forbearance or action by Hesco. However, this is of no moment as the court has found that valid enforceable contracts exist which extinguish this claim.  *Lynch v. Sease*, 244 Fed.Appx. 736, 739 (6th Cir. 2007)("Once it is established, either by an admission of a party or by a judicial finding, that there is in fact an enforceable contract between the parties, and therefore consideration exists, then a party may no longer recover under the theory of promissory estoppel").

Hesco's contracts with Ford contemplate the same performance in issue in this claim.  In the complaint, Hesco alleges that it (1) invested substantial amounts of money to expand, (2) provided Ford with proprietary information and know-how, (3) provided Ford tours of its facility, (4) became a FAD, and (5) invested time and money in becoming a distributor of both Powertrain and Motorcraft products.  Second Amended and Supplemental Complaint, ¶¶ 170-176.  The contracts require in the Standard Provisions that Hesco "actively and aggressively promote and make sales of Ford Authorized Remanufactured Products," ¶ 2(a), maintain facilities adequate in size, layout and appearance, including warehouse and sales, sales and office space, signage, computer information systems and other equipment as will meet the requirements of Ford ¶ 2(b), as well as various terms governing access to Hesco's books and records, maintaining reports, permitting inspections of facilities, production processes, equipment, methods and inventories.  ¶ 2 (f), (I), (j), and (k); Addendum, ¶ 7.

---

[2]"There's going to be three or four remans left.  You all stick in there and you'll probably be one of them."  "He said we would make money if we became a FAD."

Hesco insists that the contracts did not permit Ford "to usurp Hesco's remanufacturing expertise and know-how" without compensation. Hesco's Response, p. 57. For the same reasons that the unjust enrichment and quantum meruit claims fail, so also does the promissory estoppel claim. There was no agreement reached and the term was abandoned in later drafts of the agreement. No promise can be found here under these facts.

Summary judgment will be granted in Ford's favor on the Eighth Count of the Second Amended and Supplemental Complaint.

## IV.  DN 176

### A.  Tortious Interference with Economic Advantage

Hesco claims that Ford tortiously interfered with its prospective economic advantage when it pressured Visteon to cease selling products manufactured with Ford-owned tooling to Hesco.[3]

In order to succeed on the claim for tortious interference with its prospective economic advantage under either Kentucky or Michigan law, Hesco must establish (1) the existence of a valid business relation or expectancy; (2) Ford's knowledge of the business relation or expectancy; (3) intentional interference by Ford improperly inducing or causing a breach or termination of the relation or expectancy; and (4) injury to Hesco by Ford's improper or unjustified interference. *See, American Council of Certified Podiatric Physicians and Surgeons v. American Board of Podiatric Surgery, Inc.*, 185 F.3d 606, 624 (6th Cir. 1999); *Monumental Life Insurance Company v. Nationwide Retirement Solutions, Inc.*, 242 F.Supp.2d 438, 450 (W.D.Ky. 2003). In order to show that it had a business expectancy, Hesco must come forward with evidence that establishes a "reasonable

---

[3]The significance of the ownership of the tooling is that Ford had the right to control the sale of products made with its own tooling and by virtue of the relationship agreement it had with Visteon. Clearly, Ford's decision to permit the use of the tooling for Visteon to make identical Visteon-branded parts was intended for Visteon's development of the independent aftermarket. There has been some discussion that there is presently some dispute over the ownership of the tooling. However, this is irrelevant to this matter, as the parties' agreements from the time of the Visteon spin-off through the time the Visteon-Hesco relationship ceased, reflect an understanding that Ford owned the tooling.

likelihood or probability" of continuing business. *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 408 (6th Cir. 1999).

Hesco attempts to establish an expectancy of continued business with Visteon by showing that the parties contracted for a year, and that Visteon continued to accept Hesco's orders for a number of months thereafter. It is not enough that the parties had a prior contractual relationship to establish a reasonable expectancy of future business. *Id.*, at 408. In fact, the year had been fraught with problems from virtually the inception of the contractual relationship as Hesco sought to make sales to Ford dealers as it started up its sales program under the letter agreement.[4] Ford was, indeed, irritated to find Hesco selling the Visteon-branded products in significant numbers to Ford dealers.[5]

Hesco understood that Visteon's goal was to develop the independent aftermarket for Visteon-branded products. It was on that understanding that the letter agreement was entered into with Visteon. While there was no time frame established for when Visteon expected to seek achievement toward this goal, Visteon expressed concern that too large a percentage of sales were being made to the Ford dealerships. Hesco has come forward with nothing to controvert the evidence of the dissatisfaction with the sales being made to Ford dealers. In light of this, the court concludes that it is not reasonable for Hesco to have anticipated continuing to do business with Visteon in this capacity.

The issue of reasonable business expectancy aside, Hesco has failed to come forward with evidence that Ford's interference with the Visteon-Hesco relationship was improper. For there to be actionable interference with a business expectancy, the interference must be unlawful or

---

[4]We note that it is irrelevant with respect to this particular point whether Visteon had led Hesco to believe that this would not pose a problem. It did, in fact, pose a problem which did not improve over the course of the period of the agreement.

[5]While Hesco represented that it sold an insignificant amount to dealers, discovery has apparently revealed that in fact Ford dealers accounted for the bulk of its sales. When this was discovered, an arrangement was reached and Visteon bought back the remainder of the products from Hesco.

malicious and improper.  *See, National Collegiate Athletic Association v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988).  Ford's actions were neither of these.

Ford had entered into the relationship agreement with Visteon in order to allow for the development of the independent aftermarket through the sale of Visteon-branded products manufactured with Ford-owned tooling.  Ford specifically limited the quantity of such products that Visteon could sell to its customers.  Visteon admittedly sold in excess of the limitations established in the agreement.  Therefore, any suggestion by Ford that such business practices be curtailed was in furtherance of this contractual right.  The verbiage identified by Hesco in various e-mails, letters and phone conversations are offered to cast Ford's actions in a bad light.  However, these matters simply do not change the fact that Ford was within its rights to insist that Visteon comply with the contract terms.  Such action is not, as a matter of law, an improper interference with Hesco's prospective economic advantage.  *Hunt v. John Deere*, 18 F.Supp.2d 697, 702-03 (W.D.Ky. 1997), *aff'd*, 162 F.3d 1161 (6th Cir. 1998).

Hesco has not come forward with evidence to show the existence of a genuine issue of material fact with respect to Ford's conduct.  Therefore, the court concludes that Ford is entitled to summary judgment as a matter of law on this tortious interference claim.  Summary judgment will be granted in favor of Ford on the Sixth Claim of the Second Amended and Supplemental Complaint.

### B.  Tortious Interference with Contracts

Hesco contends that Ford tortiously interfered with its letter agreement with Visteon.  This claim is without merit, however, as the contract between Hesco and Visteon expired on March 31, 2003 and was not renewed by the parties.  (*See*, Memorandum Opinion and Order concerning DN 178).  Thus there was no contract in force at the time Visteon determined to cease doing business with Hesco.  "Two of the necessary elements of [the tort of intentional interference with an existing

contractual relationship] are the existence of a contract between the plaintiff and a third party and a subsequent breach of the contract by the third party." *Gresh v. Waste Services of America, Inc.*, 2009 WL 383727 (6th Cir. Feb. 17, 2009), *quoting, Industrial Equipment Company v. Emerson Electric Company*, 554 F.2d 276, 289 (6th Cir. 1977).

Summary judgment will be granted in favor of Ford on the Eleventh Count of the Second Amended and Supplemental Complaint.

### Conclusion

Based upon the foregoing analysis, the court concludes that, taking the facts in the light most favorable to Hesco, it has failed to show any genuine issues of material fact to overcome summary judgment. Ford is entitled to judgment as a matter of law on all remaining claims against it. A separate order will be entered this date in accordance with this opinion.

**IT IS SO ORDERED.**